1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,                    No.  2:11-cr-00449-KJM

12                 Plaintiff,

13        v.                                       ORDER

14   BRIAN PICKARD et al.,

15                 Defendants.

16

17            Defendant moves for an order granting a reduction of his sentence to time served

18   under 18 U.S.C. § 3582(c).  Mot., ECF No. 709.  Defendant makes this motion in light of the

19   increased risks to health that the coronavirus ("COVID-19") poses to incarcerated persons and to

20   him in particular.  For the following reasons, the court GRANTS defendant's motion.

21        I.        BACKGROUND

22            On February 10, 2016, defendant Brian Pickard pled guilty to conspiracy to

23   manufacture over 100 marijuana plants under 21 U.S.C. §§ 841(a) and 846 and felon in

24   possession of a firearm under 18 U.S.C. § 922(g)(1).  Change of Plea Mins., ECF No. 517.  On

25   June 8, 2016, the undersigned sentenced him to a term of imprisonment of 87 months on the

26   conspiracy charge and 36 months on the felon in possession charge, to be served concurrently,

27   with 48 months of supervised release to follow.  Sent. Mins., ECF No. 559.  Defendant has served

28   more than two-thirds of his term of imprisonment.

1

1    Defendant is housed at Federal Correctional Institution, Lompoc ("FCI Lompoc"),

2    a minimum security prison camp, which is part of a complex shared with United States

3    Penitentiary, Lompoc ("USP Lompoc").  The government asserts the Bureau of Prisons ("BOP")

4    has quelled an outbreak of coronavirus there.  Opp'n at 8, ECF No. 713.  Defendant contests this

5    assertion.  Mot. at 11–14.

6    Defendant asserts he has medical conditions that make him particularly vulnerable

7    to serious harm from COVID-19.  He states he has moderate to severe asthma and Hashimoto's

8    disease.[1]  Mot. at 5–6.  His medical records show asthma and hypothyroidism.  Mot. Ex. 8, Med.

9    Records, ECF No. 709-8.  He presented to prison medical staff with complaints of wheezing,

10   shortness of breath, and respiratory distress on September 22, 2019 and was diagnosed with

11   bronchitis.  *Id.*  He was again diagnosed with bronchitis on February 7, 2020.  *Id.*

12   On April 6, 2020, defendant requested that the warden at Lompoc consider him for

13   compassionate release under 18 U.S.C. § 3582(c)(1)(A).  Mot. Ex. 3, Compassionate Release

14   Req., ECF No. 709-3.  On April 14, 2020, the warden denied his request.  Mot. Ex. 4, Warden's

15   Denial, ECF No. 709-4.

16   Defendant asserts that starting on April 22, 2020, BOP staff selected him for home

17   confinement and then withdrew the recommendation or changed his date for transfer.  Mot. at 5;

18   Mot. Ex. 5–7, ECF Nos. 709-5, 6, & 7 (prison communications awarding, then changing home

19   confinement recommendation).  Ultimately, defendant was given a date of home confinement

20   placement of November 10, 2021.  Mot. Ex. 7.  The government now asserts defendant "has been

21   recommended for July 15, 2020 transfer to community confinement and already placed in

22   quarantine to prepare for that transfer."  Opp'n at 16.

23   II.    LEGAL STANDARD

24   The district court that imposed sentence on a criminal defendant has authority to

25   modify the term of imprisonment under the compassionate release statute, 18 U.S.C.

26

27   _____
     [1] Hashimoto's disease is an autoimmune disease in which the immune system attacks and harms
     the thyroid disease, causing hypothyroidism.  American Thyroid Ass'n, *Hashimoto's Thyroiditis*,
28   https://www.thyroid.org/hashimotos-thyroiditis/ (accessed July 21, 2020).

1   § 3582(c)(1)(A), as amended by the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194

2   (Dec. 21, 2018).  That statute provides, in relevant part:

> [T[he court, upon motion of the Director of the Bureau of Prisons, or
> upon motion of the defendant after the defendant has fully exhausted
> all administrative rights to appeal a failure of the Bureau of Prisons
> to bring a motion on the defendant's behalf or the lapse of 30 days
> from the receipt of such a request by the warden of the defendant's
> facility, whichever is earlier, may reduce the term of imprisonment
> (and may impose a term of probation or supervised release with or
> without conditions that does not exceed the unserved portion of the
> original term of imprisonment), after considering the factors set forth
> in section 3553(a) to the extent that they are applicable, if it finds that
> […]extraordinary and compelling reasons warrant such a reduction
> […] and that such a reduction is consistent with applicable policy
> statements issued by the Sentencing Commission[.]

11   18 U.S.C. §§ 3582(c)(1)(A); 3582(c)(1)(A)(i).

12          If the defendant has exhausted administrative remedies, the analysis is twofold.

13   First, the court must consider the same factors applicable at the original sentencing, enumerated in

14   18 U.S.C. § 3553(a), to the extent they remain applicable at the time the motion is brought.  18

15   U.S.C. § 3582(c)(1)(A).  Second, the court must find "extraordinary and compelling reasons" to

16   release a defendant from BOP custody in a policy statement.  *Id.*

17          The statute further requires "that such a reduction is consistent with applicable

18   policy statements issued by the Sentencing Commission."  *Id.* § 3582(c)(1)(A).  In 2006, the

19   Sentencing Commission issued a policy statement addressing what qualifies as "extraordinary and

20   compelling reasons" to release a defendant from BOP custody, which was included in the

21   Guidelines Manual after it was amended as a whole on November 1, 2018.  *See* U.S.S.G.

22   § 1B1.13.  Since passage in December 2018 of the First Step Act (FSA),[2] which amended § 3582

23   to allow a defendant to file a motion for compassionate release directly with the court, district

24   courts have disagreed whether U.S.S.G. § 1B1.13 remains binding.  A number of district courts

25   nationwide have determined that the policy statement provision "no longer fits with the statute,"

26   *United States v. Cantu*, 423 F. Supp. 3d 345, 351 (S.D. Tex. 2019), because the statement has not

[2] Pub. L. No. 115-391, 132 Stat. 5194 (2018).

3

1  been amended since the First Step Act passed to reflect that both defendants and the BOP may

2  move for compassionate release. *See United States v. Allen*, No. 2:17-CR-0229-TOR-12, 2019

3  WL 6529113, at *2 (E.D. Wash. Dec. 4, 2019); *United States v. Willingham*, No. CR113-010,

4  2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019) (noting "[i]n at least four judicial districts,

5  courts have determined that the First Step Act signaled an intent from Congress that district courts

6  may now consider whether extraordinary and compelling reasons for compassionate release exist

7  other than those delineated in U.S.S.G. § 1B1.13 n.1" (citations omitted)).  Many courts in this

8  circuit have nonetheless "turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary

9  and compelling reasons' that may warrant a reduction in sentence." *United States v. Esparza*, No.

10  1:07-CR-00294-BLW, 2020 WL 1696084, at *2 n.2 (D. Idaho Apr. 7, 2020) (quoting *United*

11  *States v. Gonzalez*, No. 2:18-CR-0232-TOR-15, 2020 WL 1536155, at *2 (E.D. Wash. March 31,

12  2020)); *see also Riley v. United States*, No. C19-1522 JLR, 2020 WL 1819838, at *8 (W.D.

13  Wash. Apr. 10, 2020) ("In the absence of contrary controlling authority, and given the limited

14  statutory exceptions to the general rule of the finality of judgments, this court will continue to

15  follow the guidance of the Sentencing Commission's policy statement limiting the scope of

16  "extraordinary and compelling reasons" that warrant compassionate release under § 3582(c)(1)."

17  (citing *Dillon v. United States*, 560 U.S. 817, 827 (2010))), *appeal filed*, No. 20-35334 (April 13,

18  2020).

19          However, there is also a strong contingent of cases in which the presiding judge

20  has concluded the guidelines are no longer limiting, and the court has discretion to define what

21  constitutes an "extraordinary and compelling" reason. *See, e.g.*, *United States v. Rodriguez*, 424

22  F. Supp. 3d 674, 681 (N.D. Cal. 2019) ("This court follows the growing number of district courts

23  that have concluded that, in the absence of applicable policy statements, courts can determine

24  whether any extraordinary and compelling reasons other than those delineated in U.S.S.G. §

25  1B1.13 cmt. n.1(A)-(C) warrant compassionate release."); *United States v. Chan*, No. 96-cr-

26  00094-JSW-13, 2020 WL 1527895, at *4–5 (N.D. Cal. March 31, 2020) (noting split in authority

27  and following *Rodriguez*); *United States v. Parker*, No. 2:98-CR-00749-CAS-1, 2020 WL

28  /////

2572525, at *8–9 (C.D. Cal. May 21, 2020) (collecting cases finding U.S.S.G. § 1B1.13 is no longer limiting but considering the policy statement as guidance).

In resolving the instant motion, this court considers the Sentencing Commission's policy statement as guidance, but need not determine whether it is binding in this context. The court notes as relevant here that, in addition to listing possible "extraordinary and compelling reasons," section 1B1.13 "imposes an additional consideration of whether the defendant is a danger to the safety of any other person or to the community." *United States v. Numann*, No. 3:16-CR-00025-TMB, 2020 WL 1977117, at *2 (D. Alaska Apr. 24, 2020) (citing U.S.S.G. § 1B1.13(2)).

III.   DISCUSSION

1.   Exhaustion

The government concedes defendant's motion is ripe, given that 30 days have elapsed since the receipt of defendant's request to the warden at Lompoc. The court finds the administrative exhaustion requirement is met here, without adopting the government's reading of the statute with regard to the "lapse of 30 days" language in 18 U.S.C. § 3582(c)(1)(A). *See, e.g. United States v. Johnson*, No. 2:15-cr-00003-KJM, 2020 WL 2307306, at *4 (E.D. Cal. May 8, 2020) (discussing government's contention 30 days must elapse from inmate's request regardless of response by warden).

2.   Extraordinary and Compelling Reasons

a.   The Situation at FCC Lompoc is Dangerous

The government asserts "through mass testing, quarantining, and the other measures BOP has put in place (discussed above), Lompac [sic] succeeded in quelling the outbreak." Opp'n at 8, ECF No. 713.

The government's brief, filed at 6:03 p.m. on June 23, 2020, asserts "there are currently no reported positive COVID-19 cases" at FCI Lompoc. The only authority the government cites for the proposition the outbreak is "quelled" is BOP's website. *Id.,* citing

1  Bureau of Prisons (BOP), *COVID-19 Cases* (updated daily).[3]  At approximately 10:30 a.m. the

2  next day, the Bureau of Prisons ("BOP") coronavirus site reported 1 active inmate case of

3  COVID-19, 6 staff active cases, 2 deaths and 873 inmates recovered at FCI Lompoc.  Bureau of

4  Prisons (BOP), *COVID-19 Cases* (updated daily), (accessed June 24, 2020, 10:30 A.M).

5  Defendant asserts the numbers from FCI Lompoc deserve further scrutiny, because

6  as recently as May 21, 2020, BOP was reporting 931 actively infected inmates between USP and

7  FCI combined.  Mot. at 11.  Two weeks later, defendant observes, these inmates have "magically

8  and uniformly recovered" as they were moved to the "recovered" column on BOP's website.

9  Mot. at 12.  Defendant points to a chart showing a precipitous decline of active infections

10  reported on BOP's website, showing the 931 active infections on May 20, 2020, down to 348

11  active infections the next day, and the day after that, just over 100, down to single digits or even

12  zero as of the date of the government's opposition, coinciding with inmates being categorized as

13  "recovered."  Mot. Ex. 9 at 3, ECF No. 709-9.  As of July 21, 2020, the BOP dashboard reports

14  two staff positive and no inmates positive.

15  Defendant surmises "the reason why the Camp is not reporting any active

16  infections is because it is not doing any testing."  Mot. at 13.  While the court has insufficient

17  information to make that determination, the trajectory of BOP's self-reporting of the virus at the

18  Lompoc prison raises a red flag.  Defendant attaches an unauthenticated and unsigned letter

19  purportedly by him to the undersigned dated April 25, 2020, not previously docketed or seen by

20  the court, in which he claims to be housed in a 175-man dorm in which "[a]t any time there is

21  [sic] 5 people within 4 feet of me."  Mot. Ex. 2, ECF No. 709-2.

22  While defendant's unsworn letter falls well short of evidence and is thus entitled to

23  no weight, the court finds persuasive other cases noting close quarters and dormitory-style

24  housing at FCI Lompoc.  *See, e.g., United States v. Kamaka*, CR No. 18-00085 SOM, 2020 WL

25  2820139, at *3 (D. Haw. May 29, 2020) (at USP Lompoc satellite camps inmates "reportedly live

26  in large rooms with multiple beds less than 6 feet apart.  They share a few toilets and showers.  If

27

28  [3] https://www.bop.gov/coronavirus/

1    an inmate is infected but has not been identified as such and isolated, other inmates almost

2    certainly will come into contact with him.").  In April, another court in the Ninth Circuit called

3    FCI Lompoc at the time "among the worst coronavirus hotspots in the nation."  *United States v.*

4    *Robinson*, No. 18-cr-00597-RS-1, 2020 WL 1982872, at *1 (N.D. Cal. April 27, 2020).

5                Defendant offers a declaration from a former BOP attorney, Nellie Torres Klein,

6    who was a supervising attorney at the complex at Lompoc from 2000 to 2004.  Klein Decl., ECF

7    No. 721-1.  She claims to have returned to the complex since leaving her position there and

8    maintains contact with former colleagues.  *Id.*  ¶ 3.  She avers that absent a change in the

9    architecture of the camp, inmates' living arrangement is an "open dorm" in which it is impossible

10   to practice physical distancing; she understands there has been no change in architecture.  *Id.* ¶ 4.

11   Furthermore, in her experience, the prison camp is not self-sufficient, and relies on services

12   shared throughout the complex, making it impossible to restrict access or travel between the

13   institutions.  *Id.* ¶ 5.

14               "Incarcerated/detained persons live, work, eat, study, and participate in activities

15   within congregate environments, heightening the potential for SARS-CoV-2 to spread once

16   introduced."  *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in*

17   *Correctional and Detention Facilities*, Center for Disease Control, March 23, 2020 (accessed July

18   21, 2020).[4]  Defendant points out as of the date of his motion, the population at FCI Lompoc is 28

19   inmates over its rated capacity.  Mot. at 16, citing BOP Population and Capacity Report, Ex. 10,

20   ECF No. 709-10.

21               Finally, the government asserts there were no active COVID-19 cases at the

22   Lompoc prison as of the evening of June 23, 2020; and yet by the morning of June 24, 2020, there

23   was one reported active case, as discussed above.  In other words, a facility reporting no active

24   cases has not eliminated the risk of someone's contracting the virus as the government suggests.

25   Whatever the government's method of sorting inmates by "active" versus "recovered" cases,

26   /////

27

28
[4] https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.  The court takes judicial notice of this CDC guidance.

1    there is a real possibility the categories are porous enough that there still is a risk of infection

2    from individuals marked "recovered."

3             While the government outlines BOP's policies relating to coronavirus generally, it

4    is entirely silent as to what measures, exactly, purportedly "quelled" the outbreak at Lompoc.

5    Furthermore, the government does not explain BOP's criteria for qualifying an inmate who has

6    received a positive test for the virus for transfer from the "active infection" category to the

7    "recovered" category.  Without more information, the court views with skepticism the suggestion

8    that more than 900 active infections were resolved within two weeks.

9             b.  Defendant's Health

10            Defendant says he suffers from moderate to severe asthma as well as chronic

11   bronchitis.  Mot. at 17, citing PSR at 13,¶ 58; Med. Records, Ex. 8.

12             The government contests this characterization by claiming "the CDC only

13   recognizes 'moderate to severe' asthma as a high-risk factor for COVID-10 complication."

14   Opp'n at 12, citing Centers for Disease Control, Coronavirus Disease 2019 (COVID-19), *People*

15   *Who Are at Higher Risk for Severe Illness* (accessed July 21, 2020) (noting moderate-to-severe

16   asthma as a risk factor for severe illness from COVID-19).[5]  For all higher risk individuals, the

17   CDC notes "[i]n general, the more people you interact with, the more closely you interact with

18   them, and the longer that interaction, the higher the risk of COVID-19 spread."  *Id.*  Higher risk

19   individuals should "[c]onsider avoiding activities where protective measures may be difficult,

20   such as activities where social distancing can't be maintained."  *Id.*

21            According to the government, because defendant's medical records do not

22   memorialize a level of severity, his asthma is not "moderate to severe."  Opp'n at 12 n.1.

23   Furthermore, his diagnoses of bronchitis on September 23, 2019 and February 7, 2020 are not

24   expressly characterized as "chronic."  Opp'n at 12.  Defendant is prescribed to take two puffs of

25   Albuterol four times per day to manage his asthma.  The Bureau of Prisons' own Clinical Practice

26   Guidelines indicate persons prescribed such a drug on a daily basis are considered to have

27

28   [5] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-increased-risk.html

1   "moderate persistent" asthma.  BOP, *Management of Asthma: Bureau of Prisons Clinical*

2   *Practice Guidelines* (May 2013) (last visited June 25, 2020), at 27.[6]

3            As noted, defendant presented several times to prison medical authorities in the

4   immediate run-up to the coronavirus pandemic complaining of chest pain, shortness of breath and

5   respiratory distress.  Med. Records, Ex. 8.  This is sufficient to find defendant suffers from

6   comorbidities, which render him vulnerable to a serious and possibly life-threatening case of the

7   disease.  *See* Lisa Winter, *Nearly All NYC-Area COVID-19 Hospitalizations Had Comorbidities*,

8   The Scientist, Apr. 24, 2020.[7]

9            The government asserts defendant's health condition does not fall into the

10  categories enumerated in U.S.S.G. § 1B1.13 in that he is neither terminal, nor do his conditions

11  substantially diminish defendant's ability to provide self-care in the correctional facility.  Opp'n

12  at 11.  Where avoiding the coronavirus is a component of safely managing defendant's health

13  conditions, the ability to practice physical distancing is necessary self-care.  And as discussed

14  above, the Sentencing Commission's policy statement is considered as guidance only.

15           For the foregoing reasons, the court finds extraordinary and compelling reasons to

16  modify defendant's sentence.

17           3.   Sentencing Factors

18           Even if extraordinary and compelling reasons exist to modify defendant's

19  sentence, the court must consider the sentencing factors enumerated in 18 U.S.C. § 3553(a).  18

20  U.S.C. 3582(c)(1)(A).  "[T]he Court should not grant a sentence reduction if the defendant poses

21  a risk of danger to the community, as defined in the Bail Reform Act."  *Gonzalez*, 2020 WL

22  1536155, at *2 (citing U.S.S.G. § 1B1.13).  Under the guidance of U.S.S.G. § 1B1.13, the court

23  considers if the defendant is "a danger to the safety of any other person or to the community, as

24  provided in 18 U.S.C. § 3142(g)."  U.S.S.G. § 1B1.13.

25  /////

26

27  _____

[6] https://www.bop.gov/resources/pdfs/asthma.pdf

28  [7] https://www.the-scientist.com/news-opinion/nearly-all-nyc-area-covid-19-hospitalizations-had-comorbidities-67476

1    Defendant notes the staleness of his criminal history, citing the government's own

2    response to his sentencing memorandum in which it conceded at the time of his sentencing on

3    June 8, 2016 "most of his more serious convictions are more than fifteen years old by now […]

4    his criminal history category may not accurately reflect his present threat to re-offend."  Mot. at

5    17, citing Gov't Resp. to Def's Sent. Mem. at 5, ECF No. 557.  The court agrees, having

6    considered this at sentencing in the first place, at which point it balanced a term of incarceration

7    with a lengthy period of pretrial release.  Here, effectively, defendant has served the 36 months

8    allocated to his time on his felon in possession of a firearm charge, the crime implicating

9    dangerousness to the community although not raising a presumption, *see United States v. Twine*,

10   344 F.3d 987, 988 (9th Cir. 2003), and is now serving time solely on the manufacture of

11   marijuana offense.

12   The government asserts defendant's history of not complying with conditions of

13   release during prior periods of probation means he will pose a danger to the community by not

14   heeding public health directives to reduce the spread of coronavirus.  Opp'n at 13.  Defendant's

15   history of drug dependency and past disregard for lawful orders does raise concerns about his

16   impulse control.  But beyond the government's citation to *United States v. Hir*, 517 F.3d 1081,

17   1088 (9th Cir. 2008), for the proposition that the community to be safeguarded is the community

18   writ large, the government advances no authority for this argument.  Defendant's own health,

19   which motivated his motion here, provides an incentive to comply with public health directives.

20   Lastly, defendant has served more than two-thirds of his sentence.  He may now

21   reasonably be released to the community.

22          4.  Release Plan

23   Defendant proposes to return to his home in Cottonwood, California, to reside with

24   his wife.  He asserts he will work as a self-employed landscaper.  Mot. at 19.  His motion offers

25   little other detail.  His request to the warden dated April 6, 2020 states his home in Cottonwood is

26   near St. Elizabeth Hospital where he receives care.  Mot. Ex. 3, ECF No. 709-3.  He also states he

27   was a maintenance man with a large apartment complex prior to his incarceration, and that his

28   employer is willing to hire him back.  *Id.*

1    The government objects that a full release now with a sentence of time served

2    would "short circuit" the BOP's process for home confinement.  Opp'n at 16.  The government

3    asserts BOP has approved defendant for home confinement beginning July 15, 2020, and that he

4    has already been moved into quarantine in anticipation of his release to his home.  *Id.*  In a

5    supplemental filing, the government confirms the July 15, 2020 transfer date has not only BOP

6    approval, but the approval of a Day Reporting Center to which defendant will be referred.  Supp.

7    Opp'n at 2, ECF No. 720.  At hearing, the government clarified the Sacramento Day Reporting

8    Center has accepted defendant, but the government's counsel was not able to say how frequently

9    defendant would need to check in there from his home in Cottonwood, near Redding, a nearly 3

10   hour drive each way.  In response to a question from the defense, the government's attorney also

11   declined to make representations about whether the BOP could order defendant to return to prison

12   in the future, for example, if and when the coronavirus pandemic is suppressed.

13          The court is not persuaded by the government's argument that the court should not

14   resolve defendant's motion by issuing an order granting it.  Defendant has recounted a course of

15   events in which BOP first granted him release to home confinement, then rescinded it in the

16   course of several weeks.  Mot. at 5-6.  The government does not dispute this chronology.  While

17   representing affirmatively that defendant will now be transferred to home confinement by July

18   15, 2020, the government does not promise that defendant will serve the balance of his time in

19   this manner.  While the BOP inmate locator now lists his facility as the Sacramento Residential

20   Reentry Office,[8] it GRANTS defendant's motion to clarify that he will not be at risk of return to

21   the BOP by operation of his current sentence.

22   IV.    CONCLUSION

23          For the foregoing reasons, the court GRANTS defendant's motion for release

24   under 18 U.S.C. § 3582 as follows:

25          The court modifies defendant's sentence of incarceration to time served, followed

26   by a term of 48 months of supervised release with the added special condition that for 20 months

27

28   [8] https://www.bop.gov/inmateloc/

defendant be subject to home confinement with defendant's bearing the attendant cost of location monitoring.  All other previously imposed conditions of supervised release remain in effect.  *See United States v. Lee*, No. 19-cr-00419-SI-1, 2020 WL 2512415, at *2 (N.D. Cal. May 15, 2020) (imposing special condition of home confinement).

        IT IS SO ORDERED.

DATED: July 22, 2020.

_____

CHIEF UNITED STATES DISTRICT JUDGE